## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEBRASKA

| | | |
|---|---|---|
| BRIAN A. ANDERSON, | ) | CASE NO. 8:12CV390 |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | MEMORANDUM |
| | ) | AND ORDER |
| THE NEBRASKA MEDICAL CENTER, | ) | |
| a Nebraska non-profit corporation, | ) | |
| | ) | |
| Defendant. | ) | |

This matter is before the Court on the Motion for Summary Judgment (Filing No. 51) submitted by the Defendant The Nebraska Medical Center (the "Hospital"). For the reasons discussed below, the Motion will be granted.

## FACTS

The parties' briefs (Filing Nos. 52, 60 and 66) and indexes of evidence (Filing Nos. 53 and 61) reveal that there is no genuine dispute as to the following facts.

Plaintiff Brian A. Anderson is a black male resident of Nebraska. In December 1998, he began employment at the Hospital in Omaha, Nebraska, and was at all times an at-will employee. Beginning in September 2001, he worked as a phlebotomist. His direct supervisors were Amy Brazile, Manager of Support Services, and Filadelfo Martello, Manager of Support Services-South. Generally, Anderson's duties involved the collection, preparation, and distribution of patient blood specimens. In 2008 and 2009, Anderson's performance evaluations were satisfactory or above, with the exception of his failure to document his continuing education.

On February 12, 2010, a patient ("Patient No. 1") made a complaint to the Hospital's Ninth Floor Manager, Michelle Freeman. Patient No. 1 complained that a male employee who drew her blood treated her inappropriately. Patient No. 1 stated that the employee positioned her hand between his legs, and when she moved her hand, he told her to put

her hand back and then he "danced around."  Patient No. 1 stated, "He put my hand in his junk as if he wanted me to get him off - it was very clear of his intent."  Patient No. 1 described the employee as a "large black man."

It was the Hospital's policy to direct patient complaints to the Hospital's Patient Relations Department, and Freeman reported Patient No. 1's complaint to that department. The Patient Relations Department then informed Ann Siewert of the Hospital's Employee Relations Department and Amy Brazile of the Hospital's Support Services Department about the complaint.  Brazile compiled a list of blood draws taken from Patient No. 1, and determined that Anderson, who was approximately six-feet three-inches tall and weighed approximately 280 pounds, drew blood from Patient No. 1 on February 12, 2010.  No other large, black phlebotomist had drawn blood from Patient No. 1.  Neither Siewert nor Brazile considered whether a nurse could have been the subject of Patient No. 1's complaint, because it was their understanding that Hospital nurses typically did not draw blood by way of "arm pokes."

On February 17, 2010, Brazile and Siewert met with Anderson regarding Patient No. 1's complaint.  Brazile and Siewert counseled Anderson on the importance of being aware of patients' perceptions when he touched them or positioned their extremities during the performance of his job duties. Brazile and Siewert told Anderson that if he did hold any patient's arms between his legs in the past, he should not do so in the future.

On August 24, 2010, six months after Patient No. 1's complaint, the Hospital received a second complaint from a different patient ("Patient No. 2").  Patient No. 2 complained that a "heavy set black man in a white lab coat" came to her Hospital room to take her blood and "he ran his penis over my hand."  Patient No. 2 also stated that the employee's penis was outside his pants and was bare against her skin.  Patient No. 2 did not remember the exact the date of the incident, but informed a staff member that the

incident took place the last time she was at the Hospital as an in-patient.  Becky Ferraguti, the Hospital's Patient Relations Liaison, documented the complaint.  In doing so, Ferraguti first reviewed the dates when Patient No. 2 was in the Hospital.  Ferraguti determined that Patient No. 2 had last been in the Hospital in March 2010 and determined that the date on which Patient No. 2 would have had her blood drawn was on or around March 15, 2010.

Because the Patient Relations software required a particular incident date to be entered when documenting patient complaints, Ferraguti entered March 15, 2010, as the incident date even though Patient No. 2 did not remember the exact date of the incident. Ferraguti informed Siewert and Martello of Patient No. 2's complaint, and Martello compiled a list of blood draws taken by phlebotomists from Patient No. 2 in March 2010, including the name of the phlebotomist who took each draw.  Martello determined that Anderson had drawn blood from Patient No. 2 on March 15, 2010, and other times in March 2010.

The only other male African-American phlebotomist that drew blood from Patient No. 2 in March 2010 was Nate Butler, who was not large or heavy-set.  Since Patient No. 2 said the employee was wearing a lab coat, Hospital officials did not consider whether Patient No. 2 was describing a nurse, because phlebotomists typically wore white lab coats and nurses did not.  Based on the evidence reviewed, Hospital officials concluded that Anderson was the employee to whom Patient No. 2's complaint referred.  The similar nature of Patient No. 1's complaint and Patient No. 2's complaint also led Hospital officials to give credence to the complaints.

On August 26, 2010, the Hospital terminated Anderson's employment.   He exhausted his administrative remedies and brought this action on November 5, 2012, alleging that the Hospital discriminated against him on the basis of his race or color, in

violation of 42 U.S.C. § 1981 ("Section 1981") and Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e, *et seq*. ("Title VII").

**STANDARD OF REVIEW**

"Summary judgment is appropriate when the record, viewed in the light most favorable to the non-moving party, demonstrates there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law." *Gage v. HSM Elec. Prot. Servs., Inc.*, 655 F.3d 821, 825 (8th Cir. 2011) (citing Fed. R. Civ. P. 56(c)).  The court will view "all facts in the light most favorable to the non-moving party and mak[e] all reasonable inferences in [that party's] favor." *Schmidt v. Des Moines Pub. Sch.*, 655 F.3d 811, 819 (8th Cir 2011).  "[W]here the nonmoving party will bear the burden of proof at trial on a dispositive issue . . . Rule 56(e) permits a proper summary judgment motion to be opposed by any of the kinds of evidentiary materials listed in Rule 56(c), except the mere pleadings themselves." *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986).  The moving party need not negate the nonmoving party's claims by showing "the absence of a genuine issue of material fact." *Id.* at 325.  Instead, "the burden on the moving party may be discharged by 'showing' . . . that there is an absence of evidence to support the nonmoving party's case." *Id.*

In response to the movant's showing, the nonmoving party's burden is to produce specific facts demonstrating "'a genuine issue of material fact' such that [its] claim should proceed to trial." *Nitro Distrib., Inc. v. Alticor, Inc.*, 565 F.3d 417, 422 (8th Cir. 2009) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586 (1986)). The nonmoving party "'must do more than simply show that there is some metaphysical doubt as to the material facts,' and must come forward with 'specific facts showing that there is a genuine issue for trial.'" *Torgerson v. City of Rochester*, 643 F.3d 1031, 1042

(8th Cir. 2011)  (quoting *Matsushita*, 475 U.S. at 586-87)), *cert. denied,* 132 S. Ct. 513 (2011).  "The mere existence of *some* alleged factual dispute between the parties" will not defeat an otherwise properly supported motion for summary judgment.  *Quinn v. St. Louis Cnty.*, 653 F.3d 745, 751 (8th Cir. 2011) (quoting *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247-48 (1986)) (internal quotation marks omitted).

In other words, in deciding "a motion for summary judgment, 'facts must be viewed in the light most favorable to the nonmoving party only if there is a "genuine" dispute as to those facts.'"  *Ricci v. DeStefano*, 557 U.S. 557, 586 (2009) (quoting *Scott v. Harris,* 550 U.S. 372, 380 (2007)).  Otherwise, where the Court finds that "the record taken as a whole could not lead a rational trier of fact to find for the non-moving party"–where there is no "genuine issue for trial"–summary judgment is appropriate.  *Matsushita*, 475 U.S. at 587 (quoting *First Nat'l Bank of Ariz. v. Cities Serv. Co.*, 391 U.S. 253, 289 (1968)) (internal quotation marks omitted).

## DISCUSSION

"Title VII and §1981 set forth parallel, substantially identical, legal theories of recovery in cases alleging intentional discrimination in employment on the basis of race."  *Kim v. Nash Finch Co.*, 123 F.3d 1046, 1063 (8th Cir. 1997).   "The elements of claims alleging disparate treatment on the basis of race under Title VII and intentional employment discrimination on the basis of race under § 1981 are identical."  *Id*.

Anderson contends that his claims should be reviewed under the *Price Waterhouse* burden-shifting formula, because his race or color was a motivating factor in the Hospital's decision to terminate his employment.  He suggests that the burden is on the Hospital to demonstrate that it would have terminated him even if it had not taken his race or color into account.  *Price Waterhouse v. Hopkins*, 490 U.S. 228, 242 (1989).

The Hospital contends that Anderson has no direct evidence of discrimination, and his claims must be evaluated under the burden-shifting framework of *McDonnell Douglas Corp. v. Green,* 411 U.S. 792 (1973). To establish a *prima facie* case of discrimination under the *McDonnell Douglas* framework, "a plaintiff must show (1) he is a member of a protected class, (2) he met his employer's legitimate expectations, (3) he suffered an adverse employment action, and (4) the circumstances give rise to an inference of discrimination." *Pye v. Nu Aire, Inc.*, 641 F.3d 1011, 1019 (8th Cir.2011). Once the *prima facie* case is established, the burden of production shifts to the employer to articulate a legitimate, nondiscriminatory reason for its action. *Floyd-Gimon v. Univ. of Ark. for Med. Sciences ex rel. Bd. of Trustees of Univ. Of Ark.*, 716 F.3d 1141, 1149 (8th Cir. 2013). If the defendant does so, the plaintiff then has the burden of proving that the defendant's proffered reason is a pretext for discrimination. *Id*.

Anderson has not presented direct evidence[1] of discrimination, demonstrating that race or color was a motivating factor in the Hospital's decision to terminate his employment. The fact that patients complained of misconduct on the part of an employee who fit Anderson's physical description, including his race or color, does not suggest that anyone at the Hospital had racial animus toward Anderson or was motivated to terminate Anderson because of his race or color. Accordingly, the *McDonnell Douglas* burden-shifting analysis will be applied.

Viewing the record in a light most favorable to Anderson, the Court will assume he was innocent of any wrongdoing. The Court will also assume, without deciding, that he can

---

[1]Direct evidence of discrimination "is evidence that shows a specific link between the alleged discriminatory animus and the challenged decision, sufficient to support a finding by a reasonable fact finder that an illegitimate criterion actually motivated the adverse employment action." *Evance v. Trumann Health Services, LLC*, 719 F.3d 673, 677 (8th Cir. 2013) (quoting *Russell v. City of Kansas City, Missouri*, 414 F3d 863, 866 (8th Cir. 2005)) (internal quotation marks omitted).

6

prove all four elements of a *prima facie* case of discrimination.[2]  The burden then is on the Hospital to come forward with a legitimate, non-discriminatory reason for his termination, and the Hospital has done so.  Two patients complained of separate incidents of serious misconduct on the part of an employee occurring in February and March of 2010. Anderson met the patients' description of the employee, and the Hospital concluded that he was the only employee meeting that description who was in a position to commit the alleged misconduct.  There is no dispute that the two patient complaints formed the basis for Anderson's termination.

Because the Hospital has met its burden of coming forward with a legitimate, non-discriminatory reason for his termination, it is Anderson's burden to demonstrate that the Hospital's proffered reason for terminating him–patient complaints–was a pretext for race or color discrimination.  "A reason cannot be proved to be pretext for *discrimination* unless it is shown *both* that the reason was false, *and* that discrimination was the real reason." *Bone v. G4S Youth Servs., LLC*, 686 F.3d 948, 955 (8th Cir. 2012) (quoting *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 515 (1993)) (internal quotation marks omitted). Anderson cannot meet that burden simply by showing that the Hospital's investigation was not thorough, or that his termination lacked fundamental fairness or due process.[3]

---

[2]  The Hospital denies that Anderson can prove he met the Hospital's legitimate expectations, or that the circumstances of the termination give rise to any inference of discrimination.

[3]  In *Evance,* a nurse was terminated from her job at a nursing home due to allegations of inappropriate contact with a patient.  She sued her former employer under Title VII, alleging discrimination on the basis of her sex and religion, and she complained that her accusers were not credible and the employer's investigation was not thorough.  Upholding the district court's grant of summary judgment for the defendants, the Eighth Circuit stated, "We are not a super-personnel department with the power to second-guess employers' business decisions." 719 F.3d at 678 (quoting *Russell v. TG Mo. Corp.*, 340 F.3d 735, 746 (8th Cir. 2003)) (internal quotation marks omitted).

Anderson must pass a "rigorous" test, showing that he was "similarly situated in all relevant respects" to employees of a different race or color who were treated more favorably. *Evance v. Trumann Health Services, LLC*, 719 F.3d 673, 678 (8th Cir. 2013). "'[T]he individuals used for comparison must have dealt with the same supervisor, have been subject to the same standards, and engaged in the same conduct without any mitigating or distinguishing circumstances.'" *Id*. (quoting *Bone*, 686 F.3d at 956).[4]

Anderson has come forward with no evidence that the Hospital treated similarly situated non-black employees any better than it treated him. There is no evidence that non-black employees accused of misconduct received more thorough investigations, more opportunities to clear their names, or lesser forms of discipline. As in *Evance*, Anderson "does not provide any evidence that any other employees who were not [black] were accused of the exact or similar behavior as [he] was." *Id*. at 678. Although he argues that other African-American males, such as a nurse, should have been included in the Hospital's pool of suspects, that argument fails to support a claim of *race* discrimination. The fact that the Hospital may have given favorable treatment to another African-American male, such as a nurse, by failing to include him in the pool of suspects, does not provide any inference that the Hospital discriminated against Anderson on the basis of his *race.*

Anderson places considerable emphasis on the "reasonable cause finding" by an

---

[4]  The Eighth Circuit acknowledges "two lines of cases on the standard to determine whether employees are similarly situated at the prima facie stage of the *McDonnell Douglas* test." *Pye*, 641 F.3d at 1019 (quoting *Wimbley v. Cashion*, 588 F.3d 959, 962 (8th Cir. 2009)) (internal quotation marks omitted). "One line sets a 'low threshold,' requiring only that the employees are 'involved in or accused of the same or similar conduct and are disciplined in different ways.' The other line more rigorously requires that the employees be 'similarly situated in all respects.'" *Id.* Under either standard, Anderson has failed to come forward with similarly situated non-black employees who were treated less favorably.

investigator with the Nebraska Equal Opportunity Commission ("NEOC"). The investigator concluded that the Hospital:

> targeted someone who fit the description of a "black man". This is racial profiling, when the alleged perpetrator may not have been a staff member, or a phlebotomist, or a black man. Racial profiling occurs when an employee, in this instance, the Complainant, is questioned, disciplined, and terminated, on the basis of his race.

(Attachment to NEOC Determination, Filing No. 9-2.)

The Court disagrees with the NEOC investigator's definition of "racial profiling." When a crime or other misconduct has been committed, and suspects are developed based on statistical data, that is "profiling." When suspects are developed based on racial stereotypes, that is "racial profiling." When a person is subjected to a higher level of scrutiny or surveillance by law enforcement officers, merchants, landlords, or employers, because of the person's race, that is also "racial profiling." But when an eyewitness identifies a perpetrator with a physical description, and authorities narrow the suspects *based on* that physical description, that is *not* "profiling." Here, both patients identified the perpetrator as a large or heavy-set black male who came to draw their blood. The second patient noted that he wore a white lab coat. It was not inappropriate, nor was it "racial profiling" for the Hospital to try to identify the perpetrator through the use of the patients' descriptions.

## CONCLUSION

Because Anderson has not met his burden of demonstrating that the Hospital's legitimate, non-discriminatory reason for terminating his employment was a pretext for discrimination on the basis of his race or color, the Hospital's Motion for Summary Judgment will be granted.

Accordingly,

IT IS ORDERED:

1.      The Motion for Summary Judgment submitted by Defendant The

        Nebraska Medical Center (Filing No. 51) is granted;

2.      The Plaintiff's Amended Complaint (Filing No. 7) is dismissed, with

        prejudice; and

3.      A separate Judgment will be issued.

.      .

DATED this 27th day of December, 2013.

                                BY THE COURT:


                                s/Laurie Smith Camp
                                Chief United States District Judge